COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| RENE CEDILLOS VEGA, | § | No. 08-10-00327-CR |
| Appellant, | § | |
| | | Appeal from the |
| v. | § | |
| | | 394th District Court |
| THE STATE OF TEXAS, | § | |
| | | of Brewster County, Texas |
| Appellee. | § | |
| | | (TC# 3892) |
| | § | |

**O P I N I O N**

A Brewster County petit jury found Rene Cedillos Vega guilty of one count of burglary of

a habitation and two counts of aggravated assault with a deadly weapon.[1]  *See* TEX. PENAL CODE

ANN. §§ 22.02(a)(2) & 30.02(a)(3) (West 2011).  The jury assessed Vega's punishment for the

burglary count at imprisonment for 70 years plus a fine of $10,000, and it assessed his punishment

for each of the aggravated assault counts at imprisonment for 20 years plus a fine of $10,000.  The

trial court ordered that the three sentences shall run concurrently.  Vega brings four issues before this

Court.  Finding no error, we overrule Vega's issues and affirm the judgments of the trial court.

**ISSUE NUMBER ONE**

In Issue Number One, Vega argues that the evidence adduced at his trial was legally

---

[1]  In late 2009, the Brewster County grand jury returned three indictments against Vega.  The first
indictment, for burglary, alleged that, on or about May 8, 2008, Vega entered Jason Hennington's habitation and
committed the felony offense of aggravated assault with a deadly weapon.  The second indictment, for aggravated
assault with a deadly weapon, alleged that, on or about May 8, 2008, Vega intentionally, knowingly, or recklessly
caused bodily injury to Jason Hennington by striking him in the head with a baseball bat.  The third indictment, also
for aggravated assault with a deadly weapon, alleged that, on or about May 8, 2008, Vega intentionally, knowingly,
or recklessly caused bodily injury to Ricky Gamboa by striking him in the head with a baseball bat.  The trial court,
at the request of the parties, consolidated the three causes for trial.  *See* TEX. PENAL CODE ANN. § 3.02(a) (West
2011).

insufficient to support his conviction for the aggravated assault of Ricky Gamboa.[2,3]   More specifically, Vega argues that the testimony of the State's key witness, Jason Hennington, was contradicted in some respects by the testimony of another State witness, Iris Chirinos.  He argues further that Hennington's testimony was "patently unbelievable" under the alleged circumstances.[4] Finally, he complains that, because Gamboa did not testify at trial, he was unable to cross-examine him about the alleged assault.

The record reflects that, at the guilt stage of trial, the State presented six witnesses.  Two of those witnesses – Jason Hennington and Anna Allen – were especially important.  Hennington, a resident of Alpine, testified that, on May 8, 2008, he threw a party at his home.  His testimony continued:

> Q: Let me ask you to kind of begin by telling us how the whole thing started.  And I don't want you to go, you know, right into the evidence.  Just kind of set the scene for the jury about what you guys were doing that day and earlier in the day and what was going on there at your house.
>
> A: Well, my cousin [Shatara Jackson] had come from Austin to visit, and we were there.  And we had a few friends over, and we were watching the basketball game, playoff basketball game.
>
> .  .  .
>
> Q: You mentioned there were several people at your house watching the basketball

---

[2]  *See* footnote one.

[3]  In his discussion of Issue Number One, Vega cites *Clewis v. State*, 922 S.W.2d 126 (Tex.Crim.App. 1996), implying that he is making a factual-insufficiency argument as well as a legal-insufficiency argument. However, Texas criminal law no longer recognizes factual-insufficiency claims.  *See Brooks v. State*, 323 S.W.3d 893 (Tex.Crim.App. 2010) (overruling *Clewis*).

[4]  Vega's argument with respect to the believability of Hennington's testimony is as follows: "Hennington's testimony is unbelievable in that he is concentrating on defending himself, heads to a different room [than] Gamboa and has never met [Vega].  It is patently unbelievable that Hennington could be defending himself from the onslaught and pay such close attention to what was happening with Gamboa."

game. Who was at your house?

A: My cousin, Shatara; Rick Gamboa; a couple of other friends I had from the [Sul Ross University] campus.

. . .

Q: As it got later on in [the] evening, did some of those people leave and some other people show up?

A: Yes, sir.

Q: Was there a party going on outside or just inside?

A: No, sir. Well, it was at my house, and occasionally we would walk outside and be on the porch, but there was no party going on outside.

Q: Did you have beer or alcohol there?

A: On the inside, yes.

. . .

Q: So what happened – as some of your friends started to leave at some point, some other – maybe some [of] your neighbors there started to show up at your house?

A: Yes, sir.

. . .

Q: And so what happened then when . . . you walked out there [onto the porch]?

A: Yes, sir. And I walked outside, and there was some commotion or something going on. And I said, you know, we don't want any trouble. We don't want any trouble. You know, we [were] going inside. Everybody just go home. And then at that point somebody grabbed my shirt and pulled me off the porch.

. . .

Q: What happened when they pulled you off?

A: Well, they pulled me off, and I stumbled. I never fell to the ground, but I stumbled. And two guys started hitting on me.

3

. . .

Q: What happened then?

A: I got them off of me, and then I got back on the porch. And then again I was, hey, we don't want any trouble; everybody just go home, we are leaving. And then a guy swings a bat and hits me on the side of the head as he is coming up the steps.

. . .

Q: Was it [Vega] or somebody else that hit you with the bat on the head initially?

A: It was somebody else.

. . .

Q: Did you see anybody else hit anybody else there outside?

A: Yes, sir.

. . .

Q: Well, who got hit and who did the hitting?

A: My cousin [Shatara Jackson] was hit.

Q: And who did the hitting?

A: He did.

Q: What did he hit her with?

A: A bat.

. . .

Q: Does [the person other than Vega] continue to swing at you?

A: Yes, sir. And every time he is swinging, I am backing up. And I took three or four hits before I even fell, or stumbled or anything.

. . .

4

Q: What happened then?

A: Well, once I fell, my friend Rick [Gamboa], who was in the house, he helped me up. And when he helped me up, he went after him with the bat.

Q: Who went after –

A: He did.

Q: So Rene Vega came into the house?

A: Yes, sir.

.  .  .

Q: So he attacked Rick, Ricky Gamboa; is that right?

A: Yes, sir.

Q: Did he hit him?

A: Yes, sir.

Q: What happened to you? Was that other person still attacking at you?

A: He was still swinging at me.

Q: Then what happened?

A: Well, me and Rick were kind of pushed into the back of the house. And once we got towards the back, I went into the bedroom and Rick went into the bathroom.

.  .  .

Q: And what did you do when you went into the bedroom?

A: Well, I closed the door and I leaned up against it. I picked up my phone and called 9-1-1.

.  .  .

Q: Let me just ask you this: At any time during the course of these events inside your

5

house, did the Defendant, Rene Vega, ever hit you with a bat or hit you with anything?

A: No, sir.

Q: So the only thing you saw was him strike Ricky Gamboa.

A: And my cousin, Shatara.

.   .   .

Q: Just make that clear.  And you are absolutely positive that that's who hit Ricky with a bat?

A: Yes, sir.

.   .   .

Q: Did he hit him around the head or –

A: In the – on the side of the head, yes, sir.

.   .   .

Q: Now, what kind of injuries did you have at that point?

A: Well, I had some knots on my head.

Q: And where were they located?

A: In the back of my head about right here (indicating).

Q: Did you ever go to the hospital to get treated for that?

A: I went to the doctor, yes, sir.

.   .   .

Q: What was the experience like for you that night?  I mean, tell us what was going through your mind as far as the fear and, you know, for your safety and that kind of thing?

A: It was terrible; just because we hadn't done anything to provoke anybody or

6

anything. I just don't understand why, why they chose us to do that, why they choose to do that, anyway. You know, I don't bother anybody, and I don't understand what made them decide they had to come to my house and beat us for no reason.

. . .

Q: Sometime after that you gave a statement [to the police]; is that right?

A: Yes, sir.

. . .

Q: I notice in your report [to the police] you indicated that the person that you identified was telling them to swing the bat. Who were you referring to – and I know you identified two people. Who was telling who to swing the bat?

. . .

A: He was telling them to swing the bat.

Q: So it wasn't the other person that you have identified here?

A: No, sir.

Q: And you are sure that it was him (indicating)?

A: Yes, sir.

Q: How can you be so sure?

A: Because the guy who was swinging at me didn't say anything. He was just swinging.

Q: And then you heard – did you see him say that while you were doing that? I mean, was there anybody else in the room that could have been saying that?

A: Well, I was on the porch when it happened, so it could have been somebody off the porch; but I am pretty positive it was him.[5]

Q: Did you recognize the voice as being his voice at that time?

---

[5]  *See* discussion of Issue Number Two.

7

A: That night, yes, sir.

.   .   .

Q: Okay.  But you did recognize the voice of Rene Vega . . . saying "swing the bats"?

A: Yes, sir.

Anna Allen, a former Alpine police officer, testified that, on the night of May 8, 2008, she responded to a 9-1-1 call and arrived at the scene at 1:50 a.m.    Her testimony continued:

Q: What happened when you got to the scene?

A: I observed two male individuals walking away from the trailer house.

.   .   .

Q: Did you identify who the individuals were?

A: I did.

Q: Who were they?

A: It was Rene Vega and Thomas Fristoe.[6]

.   .   .

Q: Other than they were carrying a bag with beer in it, did you notice anything else about the individuals, their state of intoxication or anything like that?

A: Yes.  They both appeared to be highly intoxicated.

.   .   .

Q: And did you notice anything about [Vega], any injuries or anything that might indicate he had been involved in an altercation?

A: He had blood on his hands, on his knuckles.

.   .   .

---

[6]  Other testimony established that Thomas Fristoe was Jason Hennington's neighbor at the trailer park.

8

Q: What did [Vega] say happened out there?

A: He wasn't very cooperative. He didn't say a whole lot. He said they were all partying together there at the house and there was no problem.

.   .   .

Q: Did some of the individuals there have any visible injuries?

A: They did.

Q: And who was injured; who had injuries?

A: Ingar King, she had scratches on the side of her face, around her eye.[7] And Gamboa had a busted lip and abrasions on his collarbone.

Q: Did you ask Mr. Vega about how – you know, about these injuries, if he knew anything about these injuries?

A: I don't recall if I asked him. I just remember that he was very uncooperative and he was placed in the backseat, because he could not stop yelling at the other people on the scene.

Q: Who was he yelling at?

A: He was yelling at Ingar King, and Hennington and Gamboa, also.

.   .   .

Q: What was his – I know you said you don't recall what he was yelling. What was his disposition when he was yelling it?

A: He was very angry.

.   .   .

Q: And we talked about Mr. Vega's injuries or the blood that was on his hands, some of that blood was his own blood and that was because he had a scratch or some sort of scrape, or cut or abrasion on one of his hands; is that correct?

---

[7] Other testimony established that "Ingar King" was actually Jason Hennington's cousin, Shatara Jackson.

9

A: Yes, sir.

Q: And then he had some injuries on his knuckles?

A: Yes, sir.

Q: Injuries to your knuckles consistent with being on the receiving end of an assault?

A: No, sir.

. . .

Q: Is that more consistent with being on the giving end?

A: Yes, sir.

Q: In other words, being the aggressor?

A: Yes.

Consistent with the Fourteenth Amendment's guarantee of due process of law, no criminal defendant may be convicted of an offense and denied his liberty except upon proof beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364 (1970). In assessing the "legal" sufficiency of the evidence, under the Fourteenth Amendment, to support a conviction, we consider all of the record evidence in the light most favorable to the jury's verdict and determine whether, based on that evidence, any rational jury could have found the defendant guilty of all the elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In that analysis, we take the elements of the offense as they are defined by the hypothetically correct jury charge for the case. *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex.Crim.App. 2009). "Such a charge [is] one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Malik v. State*, 953 S.W.2d 234,

240 (Tex.Crim.App. 1997).

The jury is the sole judge of the weight and credibility of the evidence. *Brooks v. State*, 323 S.W.3d 893, 899 (Tex.Crim.App. 2010). Unlike jurors, we are not fact finders, and we may not re-evaluate the weight and credibility of the evidence; rather, we act only as a "final, due process safeguard" ensuring that the evidence is at least minimally sufficient to reasonably support guilt beyond a reasonable doubt, i.e., to a high degree of certainty. *Narvaiz v. State*, 840 S.W.2d 415, 423 (Tex.Crim.App. 1992).

Texas Penal Code section 22.02(a)(2), the assault statute under which Vega was charged, provides in relevant part that a person commits aggravated assault if the person intentionally, knowingly, or recklessly causes bodily injury to another and the person uses or exhibits a deadly weapon during the commission of the assault. TEX. PENAL CODE ANN. § 22.02(a)(2) (West 2011). Texas Penal Code section 6.03 provides in relevant part that a person acts "intentionally" with respect to a result of his conduct when it is his conscious objective or desire to cause the result. TEX. PENAL CODE ANN. § 6.03 (West 2011). Texas Penal Code section 1.07(17) provides in relevant part that "deadly weapon" means "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." TEX. PENAL CODE ANN. § 1.07(17) (West 2011). The grand jury's indictment charged that, on or about May 8, 2008, Vega "did . . . intentionally, knowingly, or recklessly cause bodily injury to Ricky Arellano Gamboa, by striking [him] in the head, and [Vega] did . . . use or exhibit a deadly weapon, to-wit: [a] baseball bat, during the commission of said assault."

Given the foregoing, the hypothetically correct jury charge for the alleged aggravated assault of Gamboa would state the elements of the charged offense as follows: (1) Vega (2) intentionally,

11

knowingly, or recklessly (3) caused bodily injury to Gamboa by striking him in the head; (4) Vega used or exhibited a baseball bat during the commission of the assault; and (5) a baseball bat is a deadly weapon. After reviewing the evidence adduced at Vega's trial, as previously set forth, we conclude that a rational jury could have found Vega guilty of all the elements of the alleged aggravated assault of Gamboa, as defined by the hypothetically correct jury charge, beyond a reasonable doubt. That is, a rational jury could have concluded beyond a reasonable doubt that Vega intentionally caused bodily injury to Gamboa by striking him in the head with a baseball bat, and that a baseball bat is a deadly weapon. Hennington testified that Vega hit Gamboa on the side of the head with a baseball bat, a weapon which can obviously cause death or serious bodily injury, and Allen testified that Gamboa had a "busted lip" and that Vega, at the time in question, was angry, intoxicated, and uncooperative and had injuries consistent with being the aggressor in an assault.

We find nothing "patently unbelievable" about Hennington's testimony. Moreover, the jury was free to resolve any conflict between Hennington's testimony and that of Chirinos. The fact that Vega could not cross-examine Gamboa, who did not testify, is irrelevant. We overrule Issue Number One.

## ISSUE NUMBER TWO

In Issue Number Two, Vega argues that the evidence adduced at his trial was legally insufficient to support his conviction, as a party, for the aggravated assault of Jason Hennington.[8] Vega argues that Hennington was only "pretty positive" that he (i.e., Vega) directed another person to assault Hennington,[9] and that "pretty positive" testimony is insufficient to support a finding of

---

[8] *See* footnote one.

[9] *See* footnote five and accompanying text.

12

guilt beyond a reasonable doubt.

The record reflects that the jury charge authorized conviction of Vega as a party to the aggravated assault of Hennington. Texas Penal Code section 7.02(a)(2) provides that a person is criminally responsible, as a party, for an offense committed by another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. TEX. PENAL CODE ANN. § 7.02(a)(2) (West 2011). The grand jury's indictment charged that, on or about May 8, 2008, Vega "did . . . intentionally, knowingly, or recklessly cause bodily injury to Jason Dwayne Hennington, by striking [him] in the head, and [Vega] did . . . use or exhibit a deadly weapon, to-wit: [a] baseball bat, during the commission of said assault." We note that the State was not required to plead reliance on the law of parties in its indictment. *See* TEX. PENAL CODE ANN. § 7.01(c) (West 2011).

Given the foregoing, the hypothetically correct jury charge for the alleged aggravated assault of Hennington would state the elements of the charged offense as follows: (1) a person (2) intentionally, knowingly, or recklessly (3) caused bodily injury to Hennington by striking him in the head; (4) the person used or exhibited a baseball bat during the commission of the assault; (5) a baseball bat is a deadly weapon; and (6) Vega, acting with intent to promote or assist the commission of the assault, solicited, encouraged, directed, aided, or attempted to aid the person to commit the assault. After reviewing the evidence adduced at Vega's trial, as previously set forth, we conclude that a rational jury could have found Vega guilty of all the elements of the alleged aggravated assault of Hennington, as defined by the hypothetically correct jury charge, beyond a reasonable doubt. That is, a rational jury could have concluded beyond a reasonable doubt that a person intentionally caused bodily injury to Hennington by striking him in the head with a baseball bat, that a baseball bat is a

13

deadly weapon, and that Vega, acting with intent to promote the commission of the assault, directed that person to commit the assault. Hennington testified that he was attacked and hit in the head by a person wielding a baseball bat, that Vega directed that person to "swing the bat," and that he (i.e., Hennington) sustained head injuries from that attack. We overrule Issue Number Two.

**ISSUE NUMBER THREE**

In Issue Number Three, Vega argues that the evidence adduced at his trial was legally insufficient to support his conviction for burglary. Specifically, he argues that, "[i]f Issue No. One and Issue No. Two are successful, there is no showing of intent to commit assault as required for a conviction."

Texas Penal Code section 30.02(a)(3), the burglary statute under which Vega was charged, provides in relevant part that a person commits an offense if, without the effective consent of the owner, the person enters a habitation and commits an assault. TEX. PENAL CODE ANN. § 30.02(a)(3) (West 2011). The grand jury's indictment charged that, on or about May 8, 2008, Vega "did . . . intentionally or knowingly enter a habitation, without the effective consent of Jason Dwayne Hennington, the owner there[of], and committed the felony offense of [a]ggravated [a]ssault with a [d]eadly [w]eapon."

Given the foregoing, the hypothetically correct jury charge for the alleged burglary of Hennington's residence would state the elements of the charged offense as follows: (1) Vega (2) intentionally or knowingly (3) entered Hennington's residence (4) without Hennington's effective consent and (5) committed aggravated assault with a deadly weapon. After reviewing the evidence adduced at Vega's trial, as previously set forth, we conclude that a rational jury could have found Vega guilty of all the elements of the alleged burglary, as defined by the hypothetically correct jury

14

charge, beyond a reasonable doubt. That is, a rational jury could have concluded beyond a reasonable doubt that Vega intentionally entered Hennington's home without his consent and committed aggravated assault with a deadly weapon. Hennington testified that Vega entered his house while attacking Gamboa with a bat and while directing another person to attack Hennington with a bat. We overrule Issue Number Three.

## ISSUE NUMBER FOUR

In Issue Number Four, Vega argues that the trial court erred, at the punishment stage, in denying his motions for mistrial made after the discovery of juror misconduct. Vega argues that the jurors improperly received "extra-testimonial information" and that "such information was . . . sufficient to taint and call into question . . . the jury verdict[s] regarding punishment . . . ."

With respect to this issue, the record reflects the following: Before the start of the punishment stage, the trial court received a written note from one of the jurors. The note stated that one of the other jurors had made certain questionable comments to his fellow jurors after they had returned their verdicts at the guilt stage. More specifically, the note stated that the juror in question had told the other jurors that he knew Vega and Vega's family, that members of Vega's family had been arrested, that Vega himself had previously been arrested, and that Vega's father might still be in jail. The trial court disclosed the contents of the note to the parties, and Vega immediately moved for a mistrial, which the trial court denied. The State then presented its evidence at the punishment stage. At the close of the evidence at the punishment stage, the trial court instructed the jurors that, during their deliberations, they could not consider "any matter not shown by the evidence presented in this case." After the jurors returned their verdicts on punishment, the trial court heard testimony from each juror, individually, on the matter of the one juror's improper comments. During that

15

testimony, one of the jurors admitted making the improper comments; one of the jurors denied hearing those comments; and all of the jurors, even the one who made the comments originally, denied that they ever considered the comments during their deliberations on punishment. At the close of the jurors' testimony, Vega again moved for a mistrial, which the trial court again denied.

A mistrial is required for improper conduct that is so harmful that the case must be redone. *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex.Crim.App. 2004). Only in extreme circumstances, where the prejudice is incurable, is a mistrial required. *Id*. Prejudice is incurable when it "is of such character as to suggest the impossibility of withdrawing the impression produced on the minds of the jurors." *Ladd v. State*, 3 S.W.3d 547, 567 (Tex.Crim.App. 1999). A trial court's denial of a motion for a mistrial will be upheld on appeal absent an abuse of discretion. *Id.*

Consistent with the Fourteenth Amendment's guarantee of due process of law, the jury in a criminal trial must render its verdicts on the basis of the evidence presented at trial and not on the basis of other facts or allegations received from some other source. *Narvaiz*, 840 S.W.2d at 428. A defendant is thus entitled to a mistrial if the jury, after retiring to deliberate, receives other evidence that is adverse to the defendant. *See Bustamante v. State*, 106 S.W.3d 738, 743 (Tex.Crim.App. 2003). In determining whether such evidence was "received" by the jury, a court may consider how extensively the evidence was considered by the jury and whether the jury was given an instruction to disregard. *Id*.

We discern no abuse of discretion on the part of the trial court in its denial of Vega's motions for mistrial. The juror's unfortunate comments were not especially inflammatory, and occurred after the jurors had completed their deliberations on guilt and long before they began their deliberations on punishment. Furthermore, the trial court specifically instructed the jurors that, during their

16

deliberations on punishment, they could not consider any matter not shown by the evidence presented at trial, and all the jurors, when questioned on the matter, swore that they did not consider the juror's improper comments. We overrule Issue Number Four.

**CONCLUSION**

We affirm the judgments of the trial court.


                                        GUADALUPE RIVERA, Justice

December 21, 2011

Before McClure, C.J., Rivera, J., and Antcliff, J.

(Do Not Publish)